## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN TAYLOR,** | : | |
| **Plaintiff** | : | **No. 1:22-cv-02070** |
| | : | |
| **v.** | : | **(Judge Rambo)** |
| | : | |
| **SUPERINTENDENT KEVIN** | : | |
| **RANSOM, et al.,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Pro se Plaintiff John Taylor ("Plaintiff"), a convicted and sentenced state prisoner in the custody of the Pennsylvania Department of Corrections ("DOC"), is currently incarcerated at State Correctional Institution Dallas ("SCI Dallas") in Dallas, Pennsylvania. In accordance with the Prison Litigation Reform Act,[1] the Court conducted an initial review of Plaintiff's complaint and dismissed it without prejudice, but granted Plaintiff leave to file an amended complaint. (Doc. Nos. 7, 8.) Pending before the Court is Plaintiff's amended complaint. (Doc. No. 9.) For the reasons set forth below, the Court will partially dismiss the amended complaint.

---

[1] See The Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321 (Apr. 26, 1996).

## I.      BACKGROUND

Plaintiff filed his complaint in this Court on December 21, 2022, pursuant to the provisions of 42 U.S.C. § 1983 ("Section 1983") and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346, et seq.[2]  (Doc. No. 1.)  In his complaint, Plaintiff named the following Defendants: John Wetzel ("Wetzel"), a former Secretary of the DOC; George Little ("Little"), a former Acting Secretary of the DOC; Kevin Ransom ("Ransom"), the Superintendent at SCI Dallas; J. Eyer ("Eyer"), the Security Captain at SCI Dallas; Lieutenant B. Belles ("Belles"), the Lieutenant of the Restricted Housing Unit at SCI Dallas; Kyle Fagan ("Fagan"), a former Superintendent's Assistant at SCI Dallas; Dr. Prince ("Prince"), the Medial Director at SCI Dallas; Denise Johnson ("Johnson"), the Secretary for the Pennsylvania Department of Health; the Center for Disease Control ("CDC"); and Dr. Rochelle Walenski ("Walenski"), the Director of the CDC.  (Id. at 1-5.)

In his complaint, Plaintiff averred that the events giving rise to his claims occurred at SCI Dallas "on or about" December 7, 2020, through December 23, 2020.  (Id. at 6.)  In support, Plaintiff set forth various allegations concerning, inter

---

[2]  The complaint is dated December 21, 2022.  (Doc. No. 1 at 15.)  Although the Court did not receive the complaint until December 29, 2022, the complaint is deemed filed on December 21, 2022, pursuant to the prisoner mailbox rule.  See Pabon v. Mahanoy, 654 F.3d 385, 391 n.8 (3d Cir. 2011) (stating that "[t]he federal 'prisoner mailbox rule' provides that a document is deemed filed on the date it is given to prison officials for mailing" (citation omitted)).

alia, the management of COVID-19 at SCI Dallas, the impact that the virus has had on his health, and the time that he spent in the Restricted Housing Unit ("RHU") for, allegedly, testing positive for COVID-19.  (Id. at 6-9.)  In connection with these allegations, Plaintiff claimed that he suffered "COVID-19 related [p]neumonia, [s]inus damage in the form of an ongoing lingering infection, heightened and more frequent [a]sthma attacks, mild asphyxia, and painful [t]ics in [his] back and shoulders[,]" as well as kidney and liver damage.  (Id. at 14.)  Plaintiff appeared to assert violations of his constitutional rights under the First and Eighth Amendments to the United States Constitution pursuant to Section 1983.  (Id.)  Plaintiff also appeared to assert negligence claims under the FTCA.  (Id.)  As for relief, Plaintiff sought monetary damages on behalf of himself and for all DOC prisoners "who died while in custody[.]"  (Id.)

On January 31, 2023, the Court conducted an initial review of the complaint and dismissed it for failure to state a claim upon which relief could be granted.  (Doc. Nos. 7, 8.)  Specifically, the Court dismissed the following claims without leave to amend: Plaintiff's Sections 1983 claims against Defendants CDC and Walenski; Plaintiff's Section 1983 First Amendment claim against Defendant Fagan; Plaintiff's FTCA claims; and Plaintiff's claims for monetary relief on behalf of other inmates within the custody of the DOC.  (Id.) The Court dismissed without prejudice,

however, Plaintiff's remaining Section 1983 claims and granted Plaintiff leave to file an amended complaint within thirty (30) days.  (Id.)

On March 13, 2023, Plaintiff filed an amended complaint.  (Doc. No. 9.)  In his amended complaint, Plaintiff names the following individuals as Defendants, all of whom were named in his original complaint: Ransom; Little; Prince; Eyer; Wetzel; Johnson; and Belles.  (Id. at 1-3.)   However, Plaintiff specifically explains that he is "dropp[ing]" Defendant Belles as a Defendant in this action.  (Id. at 14.) As such, Defendant Belles will be dismissed.

In his amended complaint, Plaintiff asserts similar allegations to what he alleged his original complaint.  More specifically, he alleges that, on the evening of December 7, 2020, he ate food, which caused him food poisoning.   (Id. at 4.) Plaintiff alleges that he went to the infirmary where he spoke with Defendant Prince and a nurse.  (Id.)  He explains that he was given Pepto-Bismol, that his temperature was taken, and that he was "swabbed" twice.  (Id.)  Plaintiff also explains that, after five minutes, Defendant Prince sent him back to his cell block "since [he] was free of COVID[-19]."  (Id.)

Plaintiff asserts, however, that when he was returning to his cell block, "several" unidentified corrections officers "accosted" him.  (Id.) Specifically, Plaintiff states that he was "stopped, pat-searched, and hand-cuffed" and that he was taken back to the infirmary, where the corrections officers and Defendant Prince had

a conversation about him.  (Id.)  Plaintiff claims that the Sergeant who was present informed Defendant Prince that Plaintiff was to be placed in the RHU, as per the orders of Defendant Eyer.  (Id. at 4-5; id. at 14 (alleging that Defendant Eyer "forced" him into the RHU).)

Plaintiff alleges, however, that he "had done nothing wrong which warranted [him] going to the [RHU]" and that Defendant Prince did not speak up for him.  (Id. at 5.)  More specifically, Plaintiff alleges that Defendant Prince "knew or should have known of the foreseeable consequences of the dangers of" Plaintiff being housed in the RHU—that is, being exposed to COVID-19.  (Id.; id. at 14.)  As a result, Plaintiff claims that Defendant Prince was "indifferent" to those dangers.  (Id. at 5.)

Plaintiff alleges that, although he was given a towel, blanket, and two (2) sheets when he was in the RHU, his cell had fecal matter and yellowish stans on the back wall.  (Id. at 5-6.)  Plaintiff claims that he asked a corrections officer for cleaning supplies, but was told that he would have to wait until the morning because cleaning supplies "were not passed out at night."  (Id. at 6.)  Plaintiff also claims that, in the morning, he again asked a corrections officer for cleaning supplies and also the reason for why he was in the RHU, and the officer stated that he was there for quarantine purposes.  (Id.)  Plaintiff seems to dispute, however, the veracity of whether he actually had COVID-19 at this time.  (Id. (stating that he was basically

5

in disciplinary custody without having received a misconduct report).)  In addition, Plaintiff asserts that between the dirty cell conditions, the poor ventilation in the RHU, and potential exposure to COVID-19, he was exposed to "dangerous conditions" in his cell.  (Id. at 9; id. at 10 (alleging that being exposed to "bodily excrements without being provided proper protection during the height of the pandemic was indeed cruel and unusual punishment . . . ").)

Plaintiff asserts that, on December 23, 2020, he "was allegedly cleared of ever having the COVID-19 virus" and was moved to F-Block.  (Id. at 6.)  The following day, the inmates on F-Block were tested for COVID-19.  (Id. at 7.)  Plaintiff alleges that a corrections officer informed Plaintiff that he had tested positive for COVID-19, and directed Plaintiff to pack his property because he was going to be moved again.  (Id.)  On one hand, Plaintiff appears to dispute whether he had actually tested positive for COVID-19 at this time.  (Id. (arguing that it was not possible for him to have tested positive because he had just tested negative the night before and had not yet been retested by medical).)  On the other hand, Plaintiff seems to suggest that, after he explained that it was impossible for him to have COVID-19, he was tested for the virus.  (Id. (stating that a nurse "administered the COVID-19 tests" and that "four different swabs were placed into [P]laintiff's nostrals [sic]"); id. (acknowledging that he "tested positive for contraction of the COVID-19 virus" and that he was directed to pack his property because he was going to be moved).)

6

Plaintiff asserts that, subsequently, on January 17, 2021, he was taken to Wilkes-Barre General Hospital, where he was treated "for complex complications of COVID-19 that caused [him] to suffer acute pneumonia, liver and kidney damages, as well as damage to [his] sinuses." (Id. at 8.) Plaintiff claims that he also "now has soreness inside his nostrals [sic], labors at breathing with wheezing, and throughout his bout with COVID-19 contracted Hepititis-B [sic], Facials Tics, and Muscle Fatigue to the point of collapsing, which never occurred until after [P]laintiff contracted the virus." (Id.) Plaintiff also claims this his medications are causing his "bowel and stomach trouble[,]" which "never happened" with his medications prior to contracting COVID-19. (Id. at 8-9.)

In connection with all of these allegations, Plaintiff claims that Defendants violated his rights under the Eighth Amendment to the United States Constitution.[3] (Id. at 15.) As for relief, Plaintiff states as follows: "Plaintiff originally sought $75,000.00 and $25,500.00 for [P]laintiff's favorite charity. Plaintiff now seeks the costs of this action, the Defendants to provide [him] with a source of Vitamin C, and

---

[3] Although Plaintiff also contends that Defendants violated the Religious Land Use Institutionalized Persons Act, the Code of Ethics and Hippocratic Oath, and CDC guidelines (Doc. No. 9 at 15), the gravamen of Plaintiff's amended complaint is that Defendants violated the Eighth Amendment. Moreover, Plaintiff was granted leave to amend his Section 1983 claims. As such, the Court treats Plaintiff's complaint as asserting only a violation of his Eighth Amendment rights.

to cease and desist form [sic] denying [him] from working[,] . . . the proper fruits and vegetables[, and] return of his [t]ypewriter."  (Id.)

## II.   LEGAL STANDARD

Pursuant to 28 U.S.C. § 1915(e)(2), district courts are required to review complaints in civil actions where a litigant is proceeding in forma pauperis.  See 28 U.S.C. § 1915(e)(2).  If the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief, then the district court must dismiss the complaint.  See id.  In dismissing claims under § 1915(e)(2), district courts apply the standard governing motions to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  See Tourscher v. McCullough, 184 F.3d 236, 240 (3d Cir. 1999). To avoid dismissal under Rule 12(b)(6), a civil complaint must set out "sufficient factual matter" to show that its claims are facially plausible.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (explaining that the "plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do" (citation and internal quotation marks omitted)).

When evaluating the plausibility of a complaint, the Court is required to "accept all factual allegations in the complaint as true, construe the complaint in the

light favorable to the plaintiff, and ultimately determine whether plaintiff may be entitled to relief under any reasonable reading of the complaint." See Mayer v. Belichick, 605 F.3d 223, 229 (3d Cir. 2010); Kedra v. Schroeter, 876 F.3d 424, 434 (3d Cir. 2017) (stating that the court "must accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff]" (citation and internal quotation marks omitted)).

Additionally, in the specific context of pro se prisoner litigation, a district court must be mindful that a document filed pro se "is to be liberally construed." See Estelle v. Gamble, 429 U.S. 97, 106 (1976).  A pro se complaint, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers[.]" See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citation and internal quotation marks omitted).

## III.   DISCUSSION

### A.    Section 1983

Plaintiff has filed his amended complaint pursuant to the provisions of Section 1983, asserting a violation of his rights under the Eighth Amendment to the United States Constitution.  (Doc. No. 9.)  Section 1983 provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any

> rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress.

See 42 U.S.C. § 1983. Thus, "Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States." See Shuman v. Penn Manor School Dist., 422 F.3d 141, 146 (3d Cir. 2005) (citation omitted). Section 1983 "does not create any new substantive rights but instead provides a remedy for the violation of a federal constitutional or statutory right." See id. (citation omitted).

### B.    Personal Involvement in a Section 1983 Action

In a Section 1983 suit, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." See Iqbal, 556 U.S. at 676. Thus, in order to state a claim under Section 1983, a plaintiff must sufficiently allege that the defendants had personal involvement in the act or acts that the plaintiff claims violated his constitutional rights. See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). "A plaintiff makes sufficient allegations of a defendant's personal involvement by describing the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct." Chavarriaga v. New Jersey Dep't of Corr., 806 F.3d 210, 222 (3d Cir. 2015) (citing Rode, 845 F.2d at 1207); Dooley v. Wetzel, 957 F.3d 366, 374 (3d Cir.

2020) (stating that "[p]ersonal involvement requires particular 'allegations of personal direction or of actual knowledge and acquiescence'" (quoting Rode, 845 F.2d at 1207)). Thus, a plaintiff may not rely on respondeat superior, see id. (citation omitted), which is a theory of liability that "arises 'solely on the basis of the existence of an employer-employee relationship,' regardless of whether the employer had any part in causing harm[,]" see Santiago v. Warminster Twp., 629 F.3d 121, 128 (3d Cir. 2010) (quoting Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658, 692 (1978)).

Additionally, in the context of Section 1983, the United States Court of Appeals for the Third Circuit has recognized two (2) theories of supervisory liability. See A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004). Under one theory, a supervisor can be held liable if it is shown that he, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." See id. (citation and internal quotation marks omitted) (alteration in original); Parkell v. Danberg, 833 F.3d 313, 330 (3d Cir. 2016). Under the other theory, a supervisor can be held liable if it is shown that he "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." See A.M. ex rel. J.M.K., 372 F.3d at 586; Parkell, 833 F.3d at 330.

11

For the reasons discussed below, the Court finds that Plaintiff's amended complaint has failed to allege the personal involvement of Defendants Johnson and Prince in this Section 1983 action.

### 1.     Defendant Johnson

In his amended complaint, Plaintiff alleges that, "during the period from March 2020 to December 2020[,]" Defendant Johnson, the Secretary of Health for the Pennsylvania Department of Health and Welfare, "had the authority to oversee that the guidelines implemented by the CDC were activated throughout the entire Commonwealth[,]" including within the DOC's institutions.  (Doc. No. 9 at 11.) Plaintiff further alleges that it was Defendant Johnson's "duty" to instruct the then-Secretary of the DOC on the proper management of COVID-19, including the proper management of quarantining prisoners.  (Id.)  As a result, Plaintiff contends that Defendant Johnson "knew of or should have known of the inadequateness" of the cellblocks that served as places for quarantining at DOC institutions, including K-Block at SCI Dallas.  (Id.)  In connection with all of these allegations, Plaintiff claims that, because Defendant Johnson approved these places for quarantining, she was "directly involved" with his alleged injuries.  (Id. at 12.)

Having reviewed these allegations, however, the Court finds that Plaintiff's amended complaint, much like his original complaint, has failed to establish Defendant Johnson's personal involvement in this Section 1983 action.  Plaintiff's

amended complaint has neither alleged well-pleaded facts that Defendant Johnson established and maintained a policy, practice, or custom at SCI Dallas, which directly caused Plaintiff constitutional harm, nor alleged well-pleaded facts that she directed violations of CDC guidelines at SCI Dallas or that she knowingly acquiesced in such violations.  See A.M. ex rel. J.M.K., 372 F.3d at 586; Parkell, 833 F.3d at 330.  Instead, the Court finds that Plaintiff's broad and conclusory allegations against Defendant Johnson are based upon her role as the Secretary of Health for the Pennsylvania Department of Health and how she oversaw "the entire Commonwealth." (Doc. No. 9 at 11.)

A plaintiff, however, cannot establish personal involvement in a Section 1983 by averring that a supervisory defendant oversaw an institution, much less the entire Commonwealth of Pennsylvania.  See Evancho v. Fisher, 423 F.3d 347, 354 (3d Cir. 2005) (explaining that the attorney general could not be held liable "simply because of his position as the head of the [office of attorney general]"); Mincy v. Governor of Pennsylvania, No. 21-3263, 2022 WL 4115485, at *2 (3d Cir. Sept. 9, 2022) (unpublished) (concluding that "[t]he District Court [had] properly dismissed [plaintiff's] . . . claims against Governor Tom Wolf and the Secretary of the Pennsylvania Department of Health, which were not based on their personal involvement in the operation of [a DOC institution]" (citing Rode, 845 F.2d at 1207)).

Accordingly, the Court concludes that Plaintiff has failed to establish the personal involvement of Defendant Johnson in this Section 1983 action.  As a result, the Court will dismiss Plaintiff's Eighth Amendment claim against Defendant Johnson.

### 2.    Defendant Prince

In the amended complaint, Plaintiff alleges that Defendant Prince, the Medical Director at SCI Dallas, did not speak up for him on December 7, 2020, when the corrections officers informed Defendant Prince that they were going to house Plaintiff in the RHU.  (Doc. No. 9 at 4-5.)  In support, Plaintiff contends that Defendant Prince "knew or should have known of the foreseeable consequences of the dangers of" Plaintiff being housed in the RHU—that is, being exposed to COVID-19.  (Id. at 5; id. at 14.)  As a result, Plaintiff claims that Defendant Prince was "indifferent" to those dangers.  (Id. at 5.)

Having reviewed these allegations, however, the Court finds that Plaintiff's amended complaint, much like his original complaint, fails to establish the personal involvement of Defendant Prince in this Section 1983 action.  Although Defendant Prince has been named as a medical defendant in Plaintiff's amended complaint, there are no allegations that he acted with deliberate indifference to Plaintiff's medical needs or otherwise failed to provide adequate medical care or treatment to

14

Plaintiff.  To the contrary, Plaintiff alleges that he received Pepto-Bismol for his stomach ailments and that he was also "swabbed" for COVID-19.  (Id. at 4.)

In addition, while Plaintiff contends that Defendant Prince should have "spoke up" to the corrections officers concerning his placement in the RHU, there are no allegations that Defendant Prince had the authority at SCI Dallas to determine the housing status of the inmates confined there, or that Defendant Prince had encouraged or directed the corrections officers to place Plaintiff in the RHU.  This was a deficiency that the Court identified in Plaintiff's original complaint.  (Doc. No. 7 at 18 (explaining that Plaintiff's claim against Defendant Prince was, at best, speculative).)  Plaintiff's amended complaint, however, has added no new facts which would lead the Court to depart from its prior conclusion.

Accordingly, the Court concludes that Plaintiff has failed to establish the personal involvement of Defendant Prince in this Section 1983 action.  As a result, the Court will dismiss Plaintiff's Eighth Amendment claim against Defendant Prince.

### C.    The Eighth Amendment

 "The Eighth Amendment, made applicable to the States through the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual punishments.'"  Glossip v. Gross, 576 U.S. 863, 876 (2015).  As explained by the United States Supreme Court, the Constitution "does not mandate comfortable

prisons, and only those deprivations denying the minimal civilized measure of life's necessities, are sufficiently grave to form the basis of an Eighth Amendment violation." See Wilson v. Seiter, 501 U.S. 294, 298 (1991) (internal citations and quotation marks omitted).

Thus, in order "[t]o determine whether prison officials have violated the Eighth Amendment, [courts] apply a two-prong test[.]" See Porter v. Pennsylvania Dep't of Corr., 974 F.3d 431, 441 (3d Cir. 2020) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)).   Under the first prong, courts consider whether the deprivation was "'objectively, sufficiently serious[,]" that is, whether "a prison official's act or omission [resulted] in the denial of the minimal civilized measure of life's necessities[.]'" See id. (quoting Farmer, 511 U.S. at 834).   Under the second prong, courts must consider whether the prison official was "'deliberate[ly] indifferen[t] to inmate health or safety.'" See id. (quoting Farmer, 511 U.S. at 834).

Regarding the first prong, life's necessities include food, clothing, shelter, medical care, and reasonable safety.  See Tillman v. Lebanon Cnty. Corr. Facility, 221 F.3d 410, 418 (3d Cir. 2000) (stating that "when the government takes a person into custody against his or her will, it assumes responsibility for satisfying basic human needs such as food, clothing, shelter, medical care, and reasonable safety" (citing DeShaney v. Winnebago Co. Dep't of Social Svcs., 489 U.S. 189, 199-200 (1989))); Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 256 (3d Cir. 2010)

16

(explaining that the Eighth Amendment imposes a duty upon prison officials "to ensure that inmates receive adequate food, clothing, shelter, and medical care, and [to ensure that prison officials] take reasonable measures to guarantee the safety of the inmates" (citations and internal quotation marks omitted)).

Regarding the second prong, a prison official does not act with deliberate indifference "unless the official knows of and disregards an excessive risk to inmate health or safety"—that is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." See Farmer, 511 U.S. at 837. "The knowledge element of deliberate indifference is subjective, . . . meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001) (citing Farmer, 511 U.S. at 837-38)).

Here, the Court finds that Plaintiff has alleged an objectively serious risk to his health or safety because COVID-19 presents such a risk. The Court also finds that, at this preliminary stage of the proceedings, Plaintiff has expanded upon the factual allegations against the DOC Defendants—i.e., Defendants Wetzel, Little, Ransom, and Eyer—in his amended complaint concerning their asserted personal involvement in this Section 1983 action and their asserted deliberate indifference to the objectively serious risk COVID-19 presented to Plaintiff's health and safety.

17

(Doc. No. 9 at 12-14.)  As such, the Court will allow Plaintiff's Eighth Amendment claims against these Defendants to proceed at this preliminary stage.

### D.  Leave to Amend

The final issue is whether Plaintiff should be granted leave to amend his amended complaint.  Due to the applicable liberal pleading standard, a plaintiff should generally be granted leave to amend before a Court dismisses a claim that is merely deficient.  See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002).  The Federal Rules of Civil Procedure allow for amendments to be granted liberally in light of the "principle that the purpose of pleading is to facilitate a proper decision on the merits."  See Foman v. Davis, 371 U.S. 178, 182 (1962) (citation and internal quotation marks omitted).

However, the Court may deny leave to amend where there is "undue delay, bad faith[,] or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment[.]" See id.  The Court may also deny leave to amend where the proposed amendment would be futile—that is, where the pleading, "as amended, would fail to state a claim upon which relief could be granted."  See In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1332 (3d Cir. 2002) (citations and internal quotation marks omitted).

In accordance with this standard, the Court concludes that granting Plaintiff any further leave to amend his Section 1983 claims against Defendants Johnson and Prince would be futile, as Plaintiff was already afforded the opportunity to amend his pleading in order to establish the personal involvement of these Defendants in this action.  As such, Plaintiff's Section 1983 claims against Defendants Johnson and Prince will be dismissed without leave to amend. Plaintiff will be permitted, however, to proceed on his Section 1983 Eighth Amendment claims against Defendant Ransom, Little, Eyer, and Wetzel.

## IV.   CONCLUSION

To conclude, the Court will partially dismiss Plaintiff's amended complaint (Doc. No. 9) for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2).  An appropriate Order follows.

Dated: July 18, 2023                                    s/ Sylvia H. Rambo
                                                        SYLVIA H. RAMBO
                                                        United States District Judge