## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN TAYLOR,** | : | |
| **Plaintiff** | : | **No. 1:22-cv-02070** |
| | : | |
| **v.** | : | **(Judge Rambo)** |
| | : | |
| **SUPERINTENDENT KEVIN** | : | |
| **RANSOM, <u>et</u> <u>al.</u>,** | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Before the Court is the remaining Defendants' motion to dismiss Plaintiff's
amended complaint, filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil
Procedure.  (Doc. No. 17.)  For the reasons set forth below, the Court will grant their
motion to dismiss and direct the Clerk of Court to close this case.

## I.     BACKGROUND

Plaintiff John Taylor ("Plaintiff"), a convicted and sentenced state prisoner in
the custody of the Pennsylvania Department of Corrections ("DOC"), is currently
incarcerated at State Correctional Institution Dallas ("SCI Dallas") in Dallas,
Pennsylvania.  He commenced the above-captioned action on December 21, 2022,
by filing a complaint pursuant to 42 U.S.C. § 1983 ("Section 1983") and the Federal
Tort Claims Act ("FTCA"), 28 U.S.C. § 1346, <u>et</u> <u>seq.</u>[1]  (Doc. No. 1.)   In his

---

[1]  Plaintiff's original complaint is dated December 21, 2022.  (Doc. No. 1 at 15.)
Although the Court did not receive it until December 29, 2022, Plaintiff complaint
is deemed filed on December 21, 2022, pursuant to the prisoner mailbox rule.  <u>See</u>

complaint, Plaintiff named the following Defendants: John Wetzel ("Wetzel"), a former Secretary of the DOC; George Little ("Little"), a former Deputy Secretary of the DOC; Kevin Ransom ("Ransom"), the Superintendent at SCI Dallas; J. Eyer ("Eyer"), the Security Captain at SCI Dallas; Lieutenant B. Belles ("Belles"), the Lieutenant of the Restricted Housing Unit ("RHU") at SCI Dallas; Kyle Fagan ("Fagan"), a former Superintendent's Assistant at SCI Dallas; Dr. Prince ("Prince"), the Medial Director at SCI Dallas; Denise Johnson ("Johnson"), the Secretary for the Pennsylvania Department of Health; the Center for Disease Control ("CDC"); and Dr. Rochelle Walenski ("Walenski"), the Director of the CDC. (Id. at 1–5.)

In his complaint, Plaintiff averred that the events giving rise to his claims occurred at SCI Dallas "on or about" December 7, 2020, through December 23, 2020. (Id. at 6.)   In support, Plaintiff set forth various allegations concerning, inter alia, the management of COVID-19 at SCI Dallas, the impact that the virus has had on his health, and the time that he spent in the RHU for, allegedly, testing positive for COVID-19. (Id. at 6–9.)   In connection with these allegations, Plaintiff claimed that he suffered "COVID-19 related [p]neumonia, [s]inus damage in the form of an ongoing lingering infection, heightened and more frequent [a]sthma attacks, mild

---

Pabon v. Mahanoy, 654 F.3d 385, 391 n.8 (3d Cir. 2011) (stating that "[t]he federal 'prisoner mailbox rule' provides that a document is deemed filed on the date it is given to prison officials for mailing" (citation omitted)).

asphyxia, and painful [t]ics in [his] back and shoulders[,]" as well as kidney and liver damage.  (Id. at 14.)  Plaintiff appeared to assert violations of his constitutional rights under the First and Eighth Amendments to the United States Constitution pursuant to Section 1983.  (Id.)  Plaintiff also appeared to assert negligence claims under the FTCA.  (Id.)  As for relief, Plaintiff sought monetary damages on behalf of himself and for all DOC prisoners "who died while in custody[.]"  (Id.)

On January 31, 2023, the Court conducted an initial review of Plaintiff's complaint and dismissed it for failure to state a claim upon which relief could be granted.  (Doc. Nos. 7, 8.)  Specifically, the Court dismissed the following claims without leave to amend: Plaintiff's Sections 1983 claims against Defendants CDC and Walenski; Plaintiff's Section 1983 First Amendment claim against Defendant Fagan; Plaintiff's FTCA claims; and Plaintiff's claims for monetary relief on behalf of other inmates within the custody of the DOC. (Id.)  However, the Court dismissed, without prejudice, Plaintiff's remaining Section 1983 claims and granted Plaintiff leave to file an amended complaint within thirty (30) days.  (Id.)

On March 13, 2023, Plaintiff filed an amended complaint.  (Doc. No. 9.)  In his amended complaint, Plaintiff names the following individuals as Defendants, all of whom were named in his original complaint: Ransom; Little; Prince; Eyer; Wetzel; Johnson; and Belles.  (Id. at 1–3.)  However, because Plaintiff specifically states in his amended complaint that Defendant Belles "is hereby dropped" as a

Defendant in this action (id. at 14), Defendant Belles was dismissed from this action. (Doc. Nos. 10, 11).

In his amended complaint, Plaintiff asserts similar allegations to those asserted in his complaint. He alleges that, on the evening of December 7, 2020, he ate food, which caused him food poisoning. (Id. at 4.) He then went to the infirmary where he spoke with Defendant Prince and a nurse. (Id.) He explains that he was given Pepto-Bismol, that his temperature was taken, and that he was "swabbed" twice. (Id.) Plaintiff also explains that, after five minutes, Defendant Prince sent him back to his cell block "since [he] was free of COVID[-19]." (Id.)

Plaintiff asserts, however, that when he was returning to his cell block, "several" unidentified corrections officers "accosted" him. (Id.) Specifically, Plaintiff states that he was "stopped, pat-searched, and hand-cuffed" and that he was taken back to the infirmary, where the corrections officers and Defendant Prince had a conversation about him. (Id.) Plaintiff claims that the Sergeant who was present informed Defendant Prince that Plaintiff was to be placed in the RHU, as per the orders of Defendant Eyer. (Id. at 4–5; id. at 14 (alleging that Defendant Eyer "forced" him into the RHU).)

Plaintiff alleges, however, that he "had done nothing wrong which warranted [him] going to the [RHU]" and that Defendant Prince did not speak up for him. (Id. at 5.) More specifically, Plaintiff alleges that Defendant Prince "knew or should

4

have known of the foreseeable consequences of the dangers of" Plaintiff being housed in the RHU—that is, being exposed to COVID-19.  (Id.; id. at 14.)  As a result, Plaintiff claims that Defendant Prince was "indifferent" to those dangers.  (Id. at 5.)

Plaintiff alleges that, although he was given a towel, blanket, and two (2) sheets when he was in the RHU, his cell had fecal matter and yellowish stans on the back wall.  (Id. at 5–6.)  Plaintiff claims that he asked a corrections officer for cleaning supplies but was told that he would have to wait until the morning because cleaning supplies "were not passed out at night."  (Id. at 6.)  Plaintiff also claims that, in the morning, he again asked a corrections officer for cleaning supplies and also the reason for why he was in the RHU, and the officer stated that he was there for quarantine purposes.  (Id.)  Plaintiff seems to dispute, however, the veracity of whether he actually had COVID-19 at this time.  (Id. (stating that he was basically in disciplinary custody without having received a misconduct report).)  In addition, Plaintiff asserts that, between the dirty cell conditions, the poor ventilation in the RHU, and potential exposure to COVID-19, he was exposed to "dangerous conditions" in his cell.  (Id. at 9; id. at 10 (alleging that being exposed to "bodily excrements without being provided proper protection during the height of the pandemic was indeed cruel and unusual punishment . . . ").)

Plaintiff asserts that, on December 23, 2020, he "was allegedly cleared of ever having the COVID-19 virus" (id. at 6) and was moved from K-Block, where the RHU is located, to F-Block (id. at 5, 6.)  The following day, the inmates on F-Block were tested for COVID-19 "per the orders" of Defendant Ransom.   (Id. at 7.) Plaintiff alleges that a corrections officer informed him that he tested positive for COVID-19 and directed him to pack his property because he was going to be moved again.  (Id.)  On one hand, Plaintiff appears to dispute whether he had actually tested positive for COVID-19 at this time.  (Id. (arguing that it was not possible for him to have tested positive because he had just tested negative the night before and had not yet been retested by medical).)  On the other hand, Plaintiff seems to suggest that, after he explained that it was impossible for him to have COVID-19, he was tested for the virus, and he tested positive.   (Id. (stating that a nurse "administered the COVID-19 tests" and that "four different swabs were placed into [P]laintiff's nostrals [sic]"); id. (acknowledging that he "tested positive for contraction of the COVID-19 virus" and that he was directed to pack his property because he was going to be moved).)

Plaintiff asserts that, subsequently, on January 17, 2021, he was taken to Wilkes-Barre General Hospital, where he was treated "for complex complications of COVID-19 that caused [him] to suffer acute pneumonia, liver and kidney damages, as well as damage to [his] sinuses." (Id. at 8.)  Plaintiff claims that he also

6

"now has soreness inside his nostrals [sic], labors at breathing with wheezing, and throughout his bout with COVID-19 contracted Hepititis-B [sic], Facials Tics, and Muscle Fatigue to the point of collapsing, which never occurred until after [P]laintiff contracted the virus."  (Id.)  Plaintiff further claims this his medications are causing him "bowel and stomach trouble[,]" which "never happened" with his medications prior to contracting COVID-19.  (Id. at 8–9.)

In connection with all of these allegations, Plaintiff contends that he was exposed to COVID-19 while housed in the RHU on K-Block at SCI Dallas (id. at 9) and that Defendants are responsible for his exposure to the virus and for him becoming ill.  In general, Plaintiff contends that all of the remaining Defendants were required to provide him a general duty of care while he was incarcerated at SCI Dallas, but that they failed to do so.  (Id. at 12–13.)

As for Defendants Wetzel and Little, Plaintiff asserts that they knew or should have known about the conditions on K-block and, particularly, that the cells were "inadequate to serve as places of quarantine or isolation" because "the ventilation and heating system" on K-block was "non-existent[.]"  (Id. at 11); see also (id. at 12 (stating that Defendant Wetzel knew of the conditions on K-Block, approved double celling of inmates on K-Block, advised Defendant Ransom to make K-Block a quarantine and/or isolating housing unit, and knew of these "dangerous conditions" from Defendant Ransom's "previous reports" and from Plaintiff's "inmate final

grievance appeal to Central Office . . . ”); id. at 13 (stating that Defendant Little was a “subordinate” and “underling” of Defendant Wetzel and, thus, Defendant Little knew what Defendant Wetzel knew); id. (stating that Defendant Little, on an unidentified date and time, “visited” SCI Dallas and “thus knew of the safety hazards and conditions” yet approved of the conditions on K-Block)).

As for Defendant Ransom, Plaintiff asserts that he housed inmates on K-Block “under the auspice” of COVID-19, even though he knew about the lack of ventilation and heating in the cells.  (Id. (stating that Defendant Ransom failed to “maintain the properties” at SCI Dallas, such as the “[c]ellblocks, [c]ompound, and prison outbuildings”).)  And, finally, as to Defendant Eyer, Plaintiff asserts that he is the individual who ordered him to be housed in the RHU.  (Id. at 14 (asserting that Defendant Eyer knew the ventilation and heating system was inadequate there and that inmates with COVID-19 were being housed there).)

In connection with all of these allegations, Plaintiff claims that Defendants violated his rights under the Eighth Amendment to the United States Constitution.[2] (Id. at 15.) As for relief, Plaintiff states as follows: “Plaintiff originally sought

---

[2] Although Plaintiff also claims that Defendants violated the Religious Land Use Institutionalized Persons Act, the Code of Ethics and Hippocratic Oath, and CDC guidelines (Doc. No. 9 at 15), the gravamen of Plaintiff's amended complaint is that Defendants violated the Eighth Amendment.  Moreover, Plaintiff was granted leave only to amend his Section 1983 claims. As such, the Court continues to treat Plaintiff's complaint as asserting a violation of his Eighth Amendment rights. (Doc. No. 10 at 7 n.3.)

$75,000.00 and $25,500.00 for [P]laintiff's favorite charity.  Plaintiff now seeks the costs of this action, the Defendants to provide [him] with a source of Vitamin C, and to cease and desist form [sic] denying [him] from working[,] . . . the proper fruits and vegetables[, and] return of his [t]ypewriter."  (Id.)

On July 18, 2023, the Court conducted an initial review of Plaintiff's amended complaint.  (Doc. Nos. 10, 11.)  The Court dismissed Plaintiff's claims against Defendants Johnson, Prince, and Belles and directed the Clerk of Court to terminate these Defendants from the caption of this case.  (Id.)  However, the Court allowed Plaintiff to proceed on his Eighth Amendment claims against Defendants Ransom, Little, Eyer, and Wetzel (hereinafter, "Defendants").  (Id.)  In particular, the Court explained that Plaintiff's amended complaint expanded upon the allegations in his complaint, with respect to Defendants, and, as such, the Court would allow Plaintiff's amended complaint to proceed beyond the preliminary stage of screening.  See (Doc. No. 10 at 17–18).

As a result, the Court directed the Clerk of Court to serve a copy of Plaintiff's amended complaint, with waivers of the service of summons, on Defendants.  (Id.)  In the interest of efficient administrative judicial economy, the Court requested Defendants to waive service pursuant to Rule 4(d) of the Federal Rules of Civil Procedure.  (Id.)

9

On August 2, 2023, Defendants filed a waiver (Doc. No. 14) and counsel entered an appearance on their behalf (Doc. No. 15.)  In addition, Defendants filed a motion to dismiss Plaintiff's amended complaint, as well as a supporting brief. (Doc. Nos. 17, 18.)  As reflected by the Court's docket, Plaintiff has not filed a response to that motion or sought an extension of time in which to do.  As a result, Defendants' motion to dismiss is ripe for the Court's resolution.

## II.   LEGAL STANDARD

In order to survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  And a claim is plausible on its face when the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  See Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

When considering a Rule 12(b)(6) motion, the court "accept[s] as true all well-pled factual allegations in the complaint and all reasonable inferences that can be drawn from them."  See Taksir v. Vanguard Grp., 903 F.3d 95, 96-97 (3d Cir. 2018) (citation and internal quotations omitted).  The court also construes the factual allegations "in the light most favorable to the plaintiff[.]"  See In re Ins. Brokerage

Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010) (citation and internal quotations omitted).  The court, however, is not required to credit "conclusions of law" or to draw "unreasonable factual inferences."  See Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc., 450 F.3d 130, 133 (3d Cir. 2006).

Additionally, the United States Court of Appeals for the Third Circuit has outlined a three-step process to determine whether a complaint meets the pleading standard established by Twombly and Iqbal.  See Connelly v. Lane Const. Corp., 809 F.3d 780, 787 (3d Cir. 2016).  First, the court "must 'tak[e] note of the elements [the] plaintiff must plead to state a claim.'"  See id. (quoting Iqbal, 556 U.S. at 675) (alterations in original).  Second, the court "should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'"  See id. (quoting Iqbal, 556 U.S. at 679).  And, third, "'[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'"  See id. (quoting Iqbal, 556 U.S. at 679).

## III.   DISCUSSION

### A.   Defendants' Motion to Dismiss

As set forth above, the remaining Defendants have filed a motion to dismiss Plaintiff's amended complaint.  (Doc. No. 17.)  In their supporting brief, Defendants argue that Plaintiff's allegations are conclusory.  (Doc. No. 18 at 6.)  Defendants also

argue that Plaintiff's amended complaint fails to state an Eighth Amendment claim upon which relief can be granted because Plaintiff's allegations have not shown that they were deliberately indifferent to his health or safety. (<u>Id.</u> at 8.) As a result, they request that the Court grant their instant motion and dismiss Plaintiff's amended complaint. (<u>Id.</u>)

Plaintiff, as stated above, has not filed a response to Defendants' motion. Thus, under the Court's Local Rules, he is deemed not to oppose the motion. <u>See</u> M.D. Pa. L.R. 7.6 (stating as follows: "Any party opposing any motion, other than a motion for summary judgment, shall file a brief in opposition within fourteen (14) days after service of the movant's brief, or, if a brief in support of the motion is not required under these rules, within seven (7) days after service of the motion. Any party who fails to comply with this rule <u>shall be deemed not to oppose</u> such motion") (emphasis added)). That said, the Court has conducted an independent and thorough review of this matter. For the reasons discussed below, the Court finds that Defendants have met their burden with respect to their instant motion to dismiss and, thus, the Court will dismiss Plaintiff's amended complaint for failure to state a claim upon which relief can be granted.

Plaintiff has filed his amended complaint pursuant to Section 1983 (Doc. No. 9), which provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia,

subjects, or causes to be subjected, any citizen of the United States or
other person within the jurisdiction thereof to the deprivation of any
rights, privileges, or immunities secured by the Constitution and laws,
shall be liable to the party injured in an action at law, suit in equity, or
other proper proceeding for redress.

See 42 U.S.C. § 1983.  Thus, "Section 1983 imposes civil liability upon any person

who, acting under the color of state law, deprives another individual of any rights,

privileges, or immunities secured by the Constitution or laws of the United States."

See Shuman v. Penn Manor School Dist., 422 F.3d 141, 146 (3d Cir. 2005) (citation

omitted).  Section 1983 "does not create any new substantive rights but instead

provides a remedy for the violation of a federal constitutional or statutory right."

See id. (citation omitted).

Here, the alleged violation is of the Eighth Amendment to the United States

Constitution.  (Doc. No. 9.)  "The Eighth Amendment, made applicable to the States

through the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual

punishments.'"  Glossip v. Gross, 576 U.S. 863, 876 (2015).  As explained by the

United States Supreme Court, the Constitution "does not mandate comfortable

prisons, and only those deprivations denying the minimal civilized measure of life's

necessities, are sufficiently grave to form the basis of an Eighth Amendment

violation."  See Wilson v. Seiter, 501 U.S. 294, 298 (1991) (internal citations and

quotation marks omitted).

Thus, in order "[t]o determine whether prison officials have violated the Eighth Amendment, [courts] apply a two-prong test[.]"  See Porter v. Pennsylvania Dep't of Corr., 974 F.3d 431, 441 (3d Cir. 2020) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)).   Under the first prong, courts consider whether the deprivation was "'objectively, sufficiently serious[,]" that is, whether "a prison official's act or omission [resulted] in the denial of the minimal civilized measure of life's necessities[.]'"  See id. (quoting Farmer, 511 U.S. at 834).  Under the second prong, courts must consider whether the prison official was "'deliberate[ly] indifferen[t] to inmate health or safety.'"  See id. (quoting Farmer, 511 U.S. at 834).

Regarding the first prong, life's necessities include food, clothing, shelter, medical care, and reasonable safety.  See Tillman v. Lebanon Cnty. Corr. Facility, 221 F.3d 410, 418 (3d Cir. 2000) (stating that "when the government takes a person into custody against his or her will, it assumes responsibility for satisfying basic human needs such as food, clothing, shelter, medical care, and reasonable safety" (citing DeShaney v. Winnebago Co. Dep't of Social Svcs., 489 U.S. 189, 199–200 (1989))); Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 256 (3d Cir. 2010) (explaining that the Eighth Amendment imposes a duty upon prison officials "to ensure that inmates receive adequate food, clothing, shelter, and medical care, and [to ensure that prison officials] take reasonable measures to guarantee the safety of the inmates" (citations and internal quotation marks omitted)).

14

Regarding the second prong, a prison official does not act with deliberate indifference "unless the official knows of and disregards an excessive risk to inmate health or safety"—that is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." See Farmer, 511 U.S. at 837. "The knowledge element of deliberate indifference is subjective, . . . meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001) (citing Farmer, 511 U.S. at 837–38)).

Here, and as an initial starting point, the Court agrees with Defendants that Plaintiff's amended complaint contains broad and generalized allegations against them. See Iqbal, 556 U.S. at 678 (explaining that conclusory statements, which are unsupported by factual allegations, are insufficient to survive a motion to dismiss). Most notably, Plaintiff's amended complaint generally fails to include dates, times, places, and any other factual context to indicate where and when Defendants' alleged wrongdoing occurred. See Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (citation omitted) (explaining that, under the pleading standard of Rule 8, "[t]he Third Circuit has held that a civil rights complaint is adequate where it states the conduct, time, place, and persons responsible").

Additionally, the Court agrees with Defendants that Plaintiff's amended complaint has not set forth well-pleaded allegations that Defendants were aware of an excessive risk of harm to Plaintiff's health or safety <u>and</u> that they disregarded that risk of harm. As such, the Court finds that Plaintiff's amended complaint has failed to allege the deliberate indifference of Defendants in this Section 1983 action. Plaintiff's failure to do so is fatal to his amended complaint, as deliberate indifference is an indispensable element of his Eighth Amendment claim. <u>See</u> <u>Hope v. Warden York Cnty. Prison</u>, 972 F.3d 310, 329 (3d Cir. 2020) (explaining that, in order "[t]o establish deliberate indifference [in the COVID-19 context, the prisoner-plaintiffs] must show [that] the Government knew of and disregarded an excessive risk to their health and safety" (emphasis and citations omitted)); <u>see also</u> <u>Farmer</u>, 511 U.S. at 837 (stating that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference).

In addition to Plaintiff's failure to allege the deliberate indifference of Defendants in this Section 1983 action, the Court also recognizes that Plaintiff's amended complaint has set forth factual allegations suggesting that prison officials were taking action at SCI Dallas to respond to the COVID-19 pandemic.  More specifically, Plaintiff's amended complaint alleges that prison officials were testing inmates for COVID-19 and were housing COVID-19 positive inmates in quarantine.

16

See, e.g., (Doc. No. 9 at 4, 5, 6, 7).  These allegations indicate that prison officials were taking steps (whether they were ultimately effective or not) to mitigate the effects of COVID-19 at SCI Dallas.  See generally Hope, 972 F.3d 310, 329–30 (explaining that "[t]he context of the Government's conduct is essential to determine whether it shows the requisite deliberate indifference" and that, in evaluating such context, a court must "afford leeway" to the expertise of both prison medical officials and administrators and must consider the action taken in response to the COVID-19 pandemic because, inter alia, constitutional rules are not "'subject to mechanical application in unfamiliar territory'" (emphasis omitted) (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 850 (1998))); see also Mincy v. Governor of Pennsylvania, No. 21-3263, 2022 WL 4115485, at *2 (3d Cir. Sept. 9, 2022) (affirming dismissal of the plaintiff's amended complaint and stating that, "[i]n light of" the preventive measures taken and "the unprecedented and evolving nature of the pandemic, [the plaintiff] [did] not have a plausible claim that prison officials disregarded an excessive risk of harm" (citation omitted)).

Accordingly, for all of these reasons, the Court concludes that Plaintiff's amended complaint fails to state an Eighth Amendment claim upon which relief can be granted.  In reaching this conclusion the Court notes that, while Plaintiff may desire more ideal conditions at SCI Dallas, "ideal" prison conditions are not "a sine qua non" of constitutional conditions.  See Hope, 972 F.3d at 327 (finding error in

such an approach and suggesting that courts must be mindful that these types of inquiries "'spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility'" (quoting <u>Bell v. Wolfish</u>, 441 U.S. 520, 539 (1979)).  Indeed, the Court is mindful that it must "defer to administrators on matters of correctional facility administration 'not merely because the administrator ordinarily will . . . have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government not the Judicial.'"  <u>See</u> <u>Hope</u>, 972 F.3d at 326–27 (quoting <u>Bell</u>, 441 U.S. at 549 (1979)).  This is especially true, here, in the context of COVID-19—an unprecedented global pandemic.

### B.    Leave to Amend

The next issue before the Court is whether Plaintiff should be granted leave to amend his amended complaint.  Due to the applicable liberal pleading standard, a plaintiff should generally be granted leave to amend before a Court dismisses a claim that is merely deficient.  <u>See</u> <u>Grayson v. Mayview State Hosp.</u>, 293 F.3d 103, 108 (3d Cir. 2002).  The Federal Rules of Civil Procedure allow for amendments to be granted liberally in light of the "principle that the purpose of pleading is to facilitate a proper decision on the merits."  <u>See</u> <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962) (citation and internal quotation marks omitted).

18

However, the Court may deny leave to amend where there is "undue delay, bad faith[,] or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment[.]" See id.  The Court may also deny leave to amend where the proposed amendment would be futile—that is, where the pleading, "as amended, would fail to state a claim upon which relief could be granted."  See In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1332 (3d Cir. 2002) (citations and internal quotation marks omitted).

In accordance with this standard, the Court concludes that, based upon the allegations asserted, and in light of the action taken by prison officials at SCI Dallas, granting Plaintiff any further leave to amend his Section 1983 claims against Defendants would be futile. As such, Plaintiff's Section 1983 claims against Defendants will be dismissed without leave to amend.  See Mincy, 2022 WL 4115485, at *2 (affirming district court's conclusion that, "in light of the preventive measures that were taken, further amendment of the complaint would be futile"). The Court finds that this conclusion is particularly appropriate where, as here, Plaintiff did not oppose Defendants' motion to dismiss, see M.D. Pa. L.R. 7.6, or seek an extension of time in which to do so, and has not communicated with the Court for quite some time. (Doc. No. 13 (containing Plaintiff's most recent filing, which is dated July 11, 2023).)

## IV.    CONCLUSION

To conclude, the Court will grant Defendants' motion to dismiss.  (Doc. No. 17.)  In addition, the Court will dismiss Plaintiff's amended complaint without any further leave to amend his pleading.  An appropriate Order follows.


Dated: March 13, 2024                                    s/ Sylvia H. Rambo
                                                         SYLVIA H. RAMBO
                                                         United States District Judge

20